IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 5, 2022

## QUARTEZ GARY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 16-02521     Paula Skahan, Judge**

### No. W2021-00315-CCA-R3-PC

A Shelby County jury convicted the Petitioner, Quartez Gary, of attempted first degree murder and employment of a firearm during the commission of a dangerous felony. The trial court imposed a sentence of twenty-three years in the Tennessee Department of Correction. On appeal, this court affirmed the judgments. *State v. Quartez Gary*, No. W2017-01495-CCA-R3-CD, 2018 WL 3689143 (Tenn. Crim. App. July 31, 2018), *no perm. app. filed*. The Petitioner timely filed a *pro se* post-conviction petition and an amended petition through appointed counsel. The post-conviction court denied relief. On appeal, the Petitioner asserts that he received the ineffective assistance of counsel at trial. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Robert Golder (at post-conviction hearing) and Shae Atkinson (on appeal), Memphis, Tennessee, for the appellant, Quartez Gary.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts
### A. Trial

A Shelby County grand jury indicted the Petitioner for attempted first degree premeditated murder and employment of a firearm during the commission of a dangerous

felony.  This court summarized the facts of the case in the opinion on direct appeal as follows:

> The victim testified that he was twenty-eight years old and a native of Memphis.  He testified that he knew the [Petitioner] and that the [Petitioner] had shot him thirteen times in June 2015.  He had known the [Petitioner] for approximately two years, through another mutual friend, and called the [Petitioner] "Sleepy."  On the night of the incident, the victim finished work and called the [Petitioner] to go out drinking.  The victim told the [Petitioner] that his pay check had "hit" his account, so the victim would pay for everything.  The two men were drinking together and, at some point during the evening, the victim passed out and woke up in the passenger seat of the [Petitioner's] car, a blue Impala.  The vehicle was parked in the driveway of someone's home, and the victim believed the [Petitioner] was inside the home.  The victim knocked on the door of the home, and the [Petitioner] answered the door "in a real rage."  The victim assumed that he and the [Petitioner] were "fixing to have a regular little argument and walk back to the car," but the [Petitioner] got in the car, locked it, and drove away without allowing the victim to get in.
>
> The victim walked to a friend's, Terrance's, house, and as he walked up the driveway, the [Petitioner] pulled up in the car.  An argument between the [Petitioner] and the victim ensued, and the victim declined a ride home from the [Petitioner].  The victim turned away from the [Petitioner], and when he did he "heard a pistol cock."  The victim "tried to turn around" to defend himself and when he did the [Petitioner] shot him in the back of the leg, breaking his femur bone.  The victim fell to the ground.  He tried to get up but kept falling, so he attempted to crawl away.  The victim crawled around the car, where he was met by the [Petitioner] who "just got to shooting."  The victim remembered hearing four or five shots.  He was shot in the head and could not see because of blood in his eye.  The [Petitioner] was "trying his best" to "unjam the pistol" at that point and the victim began "pleading" with him to stop shooting.  He told the [Petitioner] that he would not identify the [Petitioner] as the shooter but would say it was a drive by shooting if the [Petitioner] stopped.  The [Petitioner] replied by saying that the victim "had to die," all while the [Petitioner] continued to attempt to unjam the gun, which the victim described as the [Petitioner] "clicking it." While the [Petitioner] was "clicking" the gun, he "got to beating the victim over the top of [his] head with the joint."  The [Petitioner] started "panicking," "stomping" the victim and telling him to be quiet.

2

The [Petitioner] shot the victim "a couple more times" until the gun jammed again. At this point, the victim decided to play dead, so the [Petitioner] would stop shooting. The [Petitioner] then walked away briefly before returning to where the victim was lying and shot him two more times in the leg. The victim heard the [Petitioner] drive away, at which point he threw acorns at the door of his friend's home until his friend's mother came out. His friend's mother asked him who had shot him and the victim replied, "Sleepy." The victim assumed he was going to die, and he wanted someone to know who had shot him.

The victim agreed that he had prior convictions for attempted aggravated robbery and attempted aggravated burglary. The victim testified that, as a result of the shooting, he suffered permanent injuries to his hands and was injured in other areas of his body, including his neck. At the time of trial, the victim remained in physical therapy for his injuries. He also stated that he was paranoid and suffered from post-traumatic stress disorder. The victim testified that in September of 2015, three months after the incident, he went to the police station to identify the [Petitioner] in a photographic lineup and to give a statement. In the statement, he wrote that the [Petitioner] had shot him thirteen times, including three times in the head.

On cross-examination, the victim clarified that the [Petitioner] was "a friend through a friend" and that they were just acquaintances. The victim agreed that on the night of the incident, he got drunk and smoked marijuana. He stated that he might have taken a pain pill. The victim testified that he fell asleep in the vehicle because he was tired and high.

Helen Streeter testified that the victim was shot outside her house in June of 2015. She recalled that the shooting occurred around 5:45 a.m. She was folding clothes inside her house when she heard several gunshots outside her door. She looked out her door and saw the victim standing up against her garage; she had known the victim a long time as a friend of her son. Ms. Streeter also saw the individual who shot the victim. As she watched, the victim was shot again, and he fell to the ground. He was then pistol-whipped on his head before he was shot again and then pistol-whipped some more. She said that there was enough daylight for her to see clearly. She could not hear anything the victim or the shooter said during the incident. After the [Petitioner] drove away, Ms. Streeter went outside into her driveway to speak to the victim, and she called an ambulance for him. The victim said to her, "please help me, don't let me die like this." Ms. Streeter asked the victim who had shot him and he replied, "Sleepy." She identified the [Petitioner] in

3

the courtroom as the man who shot the victim. She had seen him around the neighborhood a few times. Ms. Streeter stated that she heard at least ten gunshots. She later gave a written statement to police and identified the [Petitioner] in a photographic lineup.

On cross-examination, Ms. Streeter testified that she knew who the [Petitioner] was from the neighborhood but that she asked the victim who had shot him because that was the question the paramedics were asking him.

Officer Elizabeth Kirby testified that she responded to the scene and found the victim lying in the driveway. He advised that he had been shot by "Sleepy." The victim was going in and out of consciousness. He was very bloody and had gunshot wounds to his head. She stated that he gave no description of the shooter.

Officer David Galloway testified that he was the crime scene officer who responded to the scene of the shooting, meaning he sketched a diagram of the scene as well as photographed it, and collected evidence from the scene to be logged. The victim had been transported to the hospital by the time he arrived. From the scene he recovered 9 millimeter shell casings.

On cross-examination, Officer Galloway listed the other items of evidence he recovered from the scene: a beer can, one dice, a necklace, a watch, a receipt, $118 cash, a rag, an envelope, a debit card, some items of clothing, eight 9 millimeter spent shell casings, three metal "fragments," and two 9 millimeter unspent casings. He also recovered approximately ten grams of marijuana and a pistol grip.

The [Petitioner] testified that he had known the victim for six years and that, on the day of the incident, he got a call from the victim around 8:00 p.m. asking the [Petitioner] to "hang out." They drove to a mutual friend's home in the [Petitioner's] vehicle, where the group smoked marijuana and drank alcohol. They stayed for approximately twenty minutes before leaving for "Terrance's" house, who the [Petitioner] said lived with Ms. Streeter. The men stayed at Terrance's house for most of the night, during which time the victim left in the [Petitioner's] vehicle on multiple occasions to purchase drugs while the [Petitioner] stayed at Terrance's house. At one point, the group traveled to the Drury Inn to purchase more drugs, cocaine, and marijuana, after which the [Petitioner] took the victim home. The victim wanted the [Petitioner] to drive him around in circles, and the [Petitioner] wanted to charge him for gas money, which angered the victim. The

4

[Petitioner] then drove to Ms. Streeter's house, also Terrance's house, and stopped in her driveway where both men got out of the vehicle. An argument over the money ensued, and the victim pulled a gun on the [Petitioner]. A "tussle" began with both men fighting for the gun and then the gun "started going off." The [Petitioner] stated that he was "fight[ing] for [his] life" and panicking. The [Petitioner] eventually took the gun from the victim and removed the clip and the remaining bullets. He did this so the victim would not shoot him as he left the driveway. He walked to his vehicle to call the police but his phone was dead and then, still panicking, he drove away. The victim was fully conscious when the [Petitioner] drove away. The [Petitioner] stated that "sometime" during the wrestling the victim probably got shot but he could not say for certain. He said the "tussle" lasted for ten minutes.

On cross-examination, the [Petitioner] testified that Ms. Streeter's testimony was a lie as was the victim's. He stated that during the struggle, the gun was firing very quickly and that both men were standing. After the [Petitioner] emptied the bullets from the gun, he left the weapon at the scene and drove away.

*Gary*, 2018 WL 3689143, at *1-3. The jury convicted the Petitioner as charged. *Id.* Following the jury's conviction, the trial court ordered the Petitioner to serve an effective sentence of twenty-three years. On appeal, this court affirmed the judgments. *Id.* at 1.

**B. Post-Conviction**

The Petitioner timely filed a *pro se* post-conviction petition and later an amended petition through appointed counsel.

At the post-conviction hearing, the Petitioner testified that he was raising a claim of ineffective assistance of counsel because his trial counsel ("Counsel") had not presented the victim's medical records or inconsistencies in the case. The Petitioner testified that, according to the Board of Professional Responsibility, Counsel had entered rehabilitation for drug use and had not been able to represent the Petitioner in his motion for new trial. The Petitioner stated that he was accused of shooting the victim, whom he had known as a friend for several years. The Petitioner stated that, on the night of the shooting, the victim became angry, pulled a gun on the Petitioner, and they "wrestled over the gun." The Petitioner explained that while engaged in the physical altercation, he reached for the gun, so the victim would not shoot him. During this time, the gun "went off," and the victim was shot. The Petitioner testified that he then removed the bullets from the weapon. He said that "the whole crime" was the victim's fault.

5

The Petitioner stated that he wanted the defense theory to be that he acted in self-defense. The Petitioner wanted the victim's medical records to be introduced, which Counsel attempted to obtain during the middle of the trial. The Petitioner eventually gained access to the medical records after filing his post-conviction petition. The Petitioner believed that the medical records would have revealed that the victim was intoxicated during their altercation.

The Petitioner described Counsel's representation of him as "nonchalant" and said that he did not prepare the Petitioner for trial.

On cross-examination, the Petitioner agreed that Counsel subpoenaed the medical records during trial but that they were never procured by either Counsel or his investigator. The Petitioner reviewed the records with Appellate Counsel and agreed that they indicated the victim had sustained fourteen possible gunshot wounds, with three gunshot wounds to the head. The Petitioner agreed that he testified at trial to his version of the events but said that he was not prepared to do so and had not developed a strategy for testifying with Counsel. Counsel asked him on the morning of trial, "What's [your] defense?"

The Petitioner stated that the discovery file had records indicating that the victim's fingerprints were on the gun. He also stated that "probably" the gun did not hold as many bullets as the victim claimed to have been shot with. The Petitioner stated that the victim's medical records would have shown how the victim had been shot. He agreed that the medical records would not change the fact that the Petitioner had not sustained a single bullet wound. He also agreed that the records could not change the eyewitness testimony that the Petitioner stood over the victim and beat him in the head with the weapon.

The Petitioner recalled that the State offered a plea bargain for a twenty-eight-year sentence on the day of trial that the Petitioner rejected.

On redirect-examination, the Petitioner recalled that he and Counsel first discussed procuring the medical records on the day of trial. They had not spoken about the records prior to that day.

Patience Branham testified that she was a criminal lawyer who knew of Counsel through their mutual profession. Ms. Branham "inherited" Counsel's caseload, at the behest of another lawyer, after she learned that Counsel's license had been suspended. She took the Petitioner's case, which had been the last verdict before Counsel's suspension; Ms. Branham represented the Petitioner at his motion for new trial hearing. About the medical records, Ms. Branham learned that Counsel had issued a subpoena for them, but nothing ever came of that subpoena. Ms. Branham did not recall the records being a "big

issue" at trial. Ms. Branham stated that obtaining medical records for a living person is difficult and should be done long before trial. She stated that in the case of an attempted murder charge where mental state is a factor, medical records could show potential range of the bullet or impact and indicate whether the shooting was intentional. At this point, post-conviction counsel introduced the victim's medical records as an exhibit. Ms. Branham was shown two pages from the medical records. She identified that some of the victim's bullet wounds were in a "downward motion" and some showed "upward movement," which she stated would support a struggle between the two men. Ms. Branham stated that the medical records would have been, in her opinion, important to have before trial.

On cross-examination, Ms. Branham testified that she was aware Counsel had voluntarily suspended his license after representing the Petitioner and had submitted himself to treatment. She was unaware that he had regained his license to practice in another state. She reiterated that the medical records would have been useful to show that a physical struggle occurred between the two men.

Brenda Gary, the Petitioner's mother, testified that she knew the victim and the victim's brother "from the neighborhood" prior to the victim being shot by the Petitioner. She recalled that the victim was shot by the Petitioner on June 3, 2015, and that the victim posted a video of himself on the internet ten days later, on June 13. Ms. Gary showed the video to Counsel before the Petitioner's trial who stated that it could not be admitted at trial. The video was played for the post-conviction court, showing the victim in the hospital "rapping and throwing his hand and his head."

On cross-examination, Ms. Gary agreed that the victim was bandaged in the video on his arms and on his hands.

Following the hearing, the post-conviction court reviewed the testimony as well as the medical records and the video. Thereafter, the post-conviction court issued an order, denying the Petitioner relief and stating the following:

> [Counsel] was not ineffective for failing to properly obtain copies of the victim's medical records . . . . Here, the actions of [Counsel] were not unreasonable given the theory of the case. It is clear from the record that [Counsel] was aware of the existence of medical records . . . . In summary, the medical records were not relevant to the theory of the case argued by the defense at trial, the decision not to use the medical records was reasonable, and any conclusions that could have been drawn from the records were not sufficient to alter the outcome of the case.

It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner maintains that he received the ineffective assistance of counsel because Counsel: (1) failed to obtain the medical records; (2) failed to fully advise the Petitioner on his decision to testify; and (3) voluntarily suspended his license prior to the conclusion of the case. The State responds that Counsel's representation was not ineffective regarding the victim's medical records. The State further responds that the Petitioner failed to provide testimony at the post-conviction hearing regarding his decision to testify at trial and thus has failed to meet his burden of proof. Finally, the State argues that the Petitioner has waived his claim regarding Counsel's suspension of his license.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose

8

result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at

694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). To establish prejudice, the petitioner must: (1) produce the witness or evidence at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have presented the witness or evidence; and (3) elicit both favorable and material testimony from the witness or about the evidence. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

## A. Medical Records

The Petitioner argues that Counsel was ineffective for failing to procure the victim's medical records. The Petitioner claims that the records would have supported the defense theory that the Petitioner and the victim had a physical altercation and fought for control of the weapon. This, he claims, would have cast doubt on the element of premeditation and would have supported his theory of self-defense and his claim that the victim pulled the gun initially. The State responds that Counsel was not ineffective for failing to procure the records, as Counsel did subpoena them. The State further argues that the Petitioner cannot show that failing to acquire the records prejudiced him in any way. The State further points out that the Petitioner failed to present at the post-conviction any expert testimony on the medical records that he claims would have negated the *mens rea*, and thus, he has failed to carry his burden of establishing prejudice. We agree with the State.

The post-conviction court found, related to this claim, that Counsel's decision not to procure the records prior to trial was "not unreasonable given the theory of the case." The court found that the medical records were not relevant to the theory of the defense and that "any conclusions that could have been drawn from the records were not sufficient to alter the outcome of the case."

The evidence does not preponderate against these findings. The evidence at the post-conviction hearing was that the victim had been shot thirteen or more times and several of those shots were to his head. This is strong evidence of premeditation. The Petitioner claims that the medical records might have rebutted that evidence of premeditation, however, he failed to produce a witness who could testify as to how the medical records might have impacted that implication or changed the outcome of the trial. Ms. Branham testified that the medical records would have assisted her representation of the Petitioner but, again, this is insufficient evidence for the Petitioner to meet his burden of showing he was prejudiced by Counsel's failure to produce the medical records at trial. The Petitioner is not entitled to relief.

## B. The Petitioner's Decision to Testify

10

The Petitioner contends that Counsel was ineffective for failing to properly prepare the Petitioner to testify. He concedes that there was scant testimony at the post-conviction hearing regarding this issue but points out that the issue was raised in his petition and that the post-conviction court addressed it in its final order. He contends that Counsel failed to prepare him for the fact that his decision to testify would make him subject to cross-examination, which prompted "gruesome depictions" of the victim's injuries, about which Counsel should have warned him. The State replies that the Petitioner, without presenting evidence on the issue, has not met his burden of showing Counsel's performance was deficient or that he was prejudiced in any way. Thus, the State claims that he is not entitled to relief. We agree with the State.

The post-conviction court referenced this issue in its order denying relief but did not make any findings. We reiterate that, to establish prejudice, the Petitioner must present evidence showing that a different course of action taken by Counsel would have changed the outcome of the trial. *See Owens v. State*, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999); *see also United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."); *see also Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither a trial judge nor an appellate court can speculate or guess on the question of what might have occurred at trial if different evidence or additional witnesses had been presented, without the benefit of hearing the direct evidence or testimony firsthand. *See Black* at 757. As there was no testimony about this issue, the Petitioner has not met his burden and is not entitled to relief.

### C. Counsel's Withdrawal

The Petitioner lastly contends that Counsel was ineffective for withdrawing his representation of the Petitioner when the case had not been fully adjudicated. He notes that appellate courts "may only consider issues that were not formally raised in the post-conviction petition," which is the case here, "if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020). The State responds that, because the issue was not raised in the initial brief and not decided by the post-conviction court, it is waived. We agree with the State.

Generally, issues not raised at the post-conviction level will not be addressed on appeal. *Lane v. State*, 361 S.W.3d 555, 561 (Tenn. 2010). Issues not raised at post-conviction "may" be considered on appeal if they were argued at the post-conviction hearing and decided on by the post-conviction court. *See Holland* at 458. At the post-conviction hearing, no evidence with proper foundation was presented on this issue. There

was merely speculative testimony from Ms. Branham that she had heard of Counsel's loss of license and been reassigned his cases. She had no firsthand knowledge as to whether the trial court granted Counsel's motion to withdraw from the case and on what basis. As the State argues, this was not properly litigated as an ineffective assistance of counsel claim and is waived. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE